## In re KWEIT.
## In re PERRUSI.
### Nos. 25775, 25776.

District Court, E. D. New York.
March 18, 1942.

Sidney Golding, of New York City, for Sterling National Bank & Trust Co., creditor (for motions).

Abraham Lillienthal, of New York City, for bankrupts (opposed).

BYERS, District Judge.

Motions made by Sterling National Bank & Trust Company for orders to reopen the bankrupt estates and for the appointment of a trustee, for the alleged reason that the bankrupts concealed property which should have been administered for the benefit of creditors.

The motions are factually identical with one exception, and can be disposed of together.

Each petition asserts that on November 18, 1930, the bankrupt entered into a conspiracy with his copartners to personally enrich themselves, to defraud their creditors and to avoid the payment of just debts and obligations, "by incorporating the printing business conducted by them and by issuing the stock of the corporation to be formed, to their respective wives and to thereafter at a future date discharge themselves of their obligations by filing petitions in bankruptcy in which they would not list their ownership of the assets transferred".

The petition asserts that, in furtherance of the said conspiracy, and on or about the 18th of November, 1930, which was prior to the due date of a note held by the petitioner bank upon which the various partners were endorsers, there was such a transfer of the property and assets of the printing business in which they were partners, and that the respective bankrupts became and have continued to be secretary as to Kweit, and president as to Perrusi, and directors of the corporation so formed; and on that date each bankrupt and his partners were indebted in the approximate total of $697,020.75 as to Kweit, and $1,027,076.32 as to Perrusi, being the total of the liabilities enumerated in his schedules in bankruptcy filed January 22, 1934.

It is alleged that the transfer of stock by the bankrupt to his wife rendered him insolvent, and that, pursuant to the said conspiracy, he omitted from his schedules in bankruptcy "his beneficial ownership of 30% of the stock" of the said corporation; and that, in furtherance of the conspiracy, this bankrupt and his copartners on January 22, 1934, filed petitions in bankruptcy (as to Kweit and Perrusi the proceedings were in this court), and that the bankrupts asserted that each had no assets, and failed to disclose the said beneficial stock ownership.

The petition asserts that the testimony given by these bankrupts in their respective proceedings misled the petitioner "and only recently has your petitioner ascertained and discovered the true facts herein as herein set forth, and until such time your petitioner had no knowledge of the facts".

The respective affidavits in opposition contained such factual recitals concerning the relevant circumstances and the probable

familiarity on the part of the bank therewith, that it was deemed necessary, as a preliminary step to the disposition of this motion, to refer to a special master the specific question as to the knowledge on the part of the bank in 1934 of the facts upon which it presently relies, in order that the court might be advised as to whether the application to reopen could be regarded as timely.

The special master's report in each case has now been received, and is before the court presently for confirmation.

In that connection, it has been necessary to read the testimony and to consult the files of the court in the bankruptcy proceedings, with the result that the following state of facts has been revealed:

In 1929 and 1930, these bankrupts and two others by the name of Boyajian and Cassen were conducting a printing business as a partnership known as "Advertising Agencies Service Co. Inc.", which seems to have been a profitable enterprise, but, not being content with the rewards of such efforts, they embarked upon real estate ventures conducted by Central Zone Building, Inc., and Magoba Construction Co. Inc., in both of which companies they seem to have held stock.

Those ventures were financed in part by the Sterling National Bank & Trust Company and the Marine Midland Trust Company.

In the month of November, 1930, those banks held notes made by the partners in the sum of $17,500.00 as to the Sterling, and $20,000.00 as to the Marine Midland, and the liquidation of those loans was insisted upon by the banks, acting together.

In order to raise the money, the partners had to borrow extensively, and to pledge their accounts receivable, and to place chattel mortgages upon their plant and equipment; this required the incorporation of the business, because a higher rate of interest was exacted and could be agreed to by a corporation, than would have been payable by the individuals—in view of the nature of the security.

This was accomplished with the knowledge and approval of the banks, and the notes were paid.

The said several partners were also endorsers individually of notes issued by the corporations conducting the real estate ventures which have been mentioned (Central Zone Building, Inc., and Magoba Construction Co. Inc.).

The personal relationship between the president of the Sterling National Bank, Mr. Pulvermacher, and the individuals who were conducting these real estate ventures, and with whom the partners were associates, was such that familiarity with the entire situation, as it then existed, must be ascribed to Mr. Pulvermacher, as is shown by his own testimony and that of the other witnesses who appeared before the special master.

The notes upon which these partners were endorsers were not due and payable on the date of the incorporation of the former partnership, namely, November 18, 1930.

It is asserted in the opposing affidavits, that the wife of each bankrupt advanced her personal funds to the corporation to enable it to raise the funds necessary to pay the said partnership notes—$4,000.00 as to Mrs. Kweit and a like amount as to Mrs. Perrusi —and those alleged advances are asserted to have been the consideration for the issuance of the stock in the printing business directly to the wives. Whether in fact such advances were made, and whether the money came from the personal funds of the wives, are of course matters requiring proof, which might not be easily available after the lapse of over eleven years.

Presumably a balance sheet of the copartnership assets could be prepared or produced on the question of the solvency or insolvency of the partners, in the individual sense, at the time when the corporation was formed and the money procured to pay off the two banks to the extent of $37,500.00, but what would be difficult to establish is the value in 1930 of the real estate holdings represented by the stock in the outside companies to which reference has been made, for real estate values in 1930 had not appreciably declined—they had not kept step with the fall in security values—and whether these real estate ventures seemed to be sound, viewed with the understanding of 1930, would not be easy of demonstration in the light of subsequent developments.

In 1934, these bankrupts filed their petitions, as has been stated, and listed as their only debts their several endorsements under the head of "Accommodation paper", and as to the Sterling Bank the recital is:

"Sterling National Bank & Trust Co., 122 East 42nd Street, New York City, note due December 26, 1930, in the sum of $25,000.00 made by Central Zone Building Inc. to the order of Magoba Construction Co. and indorsed with said Sterling National Bank &

Trust Co. which to the best of bankrupt's knowledge is still the owner and holder thereof. ¦25,000.00"

In the Kweit case, no proof of claim was filed by the Sterling Bank, due, it is said, to an error on the part of some one in charge of the records. That alleged error is difficult to understand, in view of the foregoing statement in the schedules. Certainly the Bank was put upon inquiry concerning the endorsers upon paper held by it.

It is not necessary to decide whether, within Re Pierson, D.C., 174 F. 160, and Williams v. Rice, 5 Cir., 30 F.2d 814, a creditor failing to file proof of claim could be afforded an opportunity to do so after so long a default, where there is no subsequently discovered property, but a mere alleged cause of action which might ripen into an asset if a trustee were to be appointed and to prevail in the anticipated litigation. The point has not been briefed, and is not necessary to decision.

In the Kweit case, no assets appearing, there was no trustee, and the case was closed pro forma, and discharge was unopposed.

In the Perrusi case, a claim was filed, and a trustee was elected, but no assets were brought to light and the case was closed on that basis, and discharge followed. There is no other factual distinction between the conduct of the two proceedings.

The special master's report states that the Bank was ignorant of the issuance of corporate stock to the respective wives on or about November 18, 1930, and so continued until October 2, 1941. "This ignorance at the time of the bankruptcies was due to its own negligence and indifference in not consulting its own records and inquiring in the bankruptcy proceedings."

This means that, if the Bank had attended the examination of either bankrupt, he could have been asked in 1934—nearly eight years ago—what had become of his interest in the printing business which was conveyed to the corporation and, depending upon the nature of the answer to that question, appropriate proceedings could have been considered at that time.

Adequate information was possessed by the Bank in its files, as was developed at the examination before the special master, and as is shown in part by the exhibit which is attached to the petition herein; that is a financial statement dated October 31, 1930, submitted by the copartnership, and recites the investment made by the partners in the real estate ventures to which reference has been made.

This somewhat tedious recital of facts is made in order that it may appear that the recitals of conspiracy on the part of these bankrupts, contained in the respective petitions to reopen, are less than convincing when tested by the evidence. The corporation was not formed as part of a conspiracy to conceal assets, but in response to this Bank's insistence, which was probably entirely justified, upon the payment of its loan; that result could not be accomplished by the partnership or the individuals composing it, which the officials of the Bank well knew and clearly approved.

It is not now apparent that, in November of 1930, it was obvious that the real estate corporations would default upon their obligations, thus rendering inevitable recourse to the endorsers.

It is by no means clear, therefore, that a trustee would be successful in litigation having for its object the bringing into the bankrupt estates of the stock issued to the respective wives.

The circumstances are thus to be distinguished from those in such a case as Tuffy v. Nichols, 2 Cir., 120 F.2d 906, in which a bankrupt estate was reopened so that a trustee might administer for the benefit of creditors a remainder interest which became vested in the bankrupt after the filing of her voluntary petition. Comparable cases to that are: In re Pierson, supra; In re Lighthall, D.C., 221 F. 791, and In re Schreiber, 2 Cir., 23 F.2d 428.

If there were a showing here of property actually owned by the bankrupt which, through mistake or other circumstance, or concealment, should be administered for the benefit of creditors, a different disposition would be appropriate, but all that these papers reveal is the possibility of litigation which might or might not be successful, and which would certainly involve preparation on both sides much more difficult in 1942, than would have been true in 1934, when the bankruptcy proceedings were closed.

In the language of Judge Hough in Re Graff, 250 F. 997, at page 999: "Proceedings upon petition to reopen need not be of a technical nature nor of any especial formality (Re Newton, [8 Cir.], 107 F. [429], 431, 46 C.C.A. 399); but there must be not only a reasonable prospect of unadministered assets, but also evidence of cred-

itors or other parties in interest making the application who would and should be benefited by its success."

It is not mere lapse of time which stands in the way of granting this motion, but the lack of appeal to the equitable instincts of the bankruptcy jurisdiction. If the Bank had chosen wilfully to ignore the professed necessity for inquiry for over seven years, with the hope of rendering the preparation of an adequate defense difficult if not impossible in the matter of the production of records (both of the partnership and the real estate corporations for whom these bankrupts were endorsers), it could not have more completely accomplished its purpose than by following the course of conduct here exposed.

I venture to think that such litigation as these motions envisage should not be encouraged by affirmative action of the court, under all the circumstances which have been brought to light.

Motions to confirm report of the special master granted and to reopen these bankruptcy proceedings denied.

Settle order.